# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES** | : | **CRIMINAL ACTION** |
| **of AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HARRY KATZIN, et al.** | : | **No. 11-226** |

## M E M O R A N D U M

PRATTER, J.                                                          MAY 9, 2012

### INTRODUCTION

Brothers Harry, Michael, and Mark Katzin, each facing charges of pharmacy burglary under 18 U.S.C. § 2118(b) and possession of Schedule II drugs with intent to distribute under 18 U.S.C. § 2118(b), have moved to suppress evidence obtained as the result of the GPS surveillance of a Dodge Caravan driven by Harry Katzin on the night of the brothers' arrest. After the brothers filed their motions and the Court held an evidentiary hearing on the matter, the Supreme Court decided *United States v. Jones*, 132 S. Ct. 945 (2012), and held that the installation and monitoring of a GPS device on a vehicle traveling on public roads constitutes a Fourth Amendment search. As a result, all parties filed supplemental briefing, and the Court held another hearing on the matter. After carefully considering the briefing and testimony, and, in large measure, as a result of newly governing Supreme Court precedent, the Court grants the suppression motions.

### FACTUAL BACKGROUND[1]

In late 2009, the Philadelphia Police Department approached the FBI about a rash of

---

[1]         Unless otherwise noted, the following factual background is drawn from testimony presented at hearings, which took place on September 15, 2011 and April 24, 2012, regarding the pretrial motions in this matter.

pharmacy burglaries in northeast Philadelphia and the greater Philadelphia region, primarily of Rite Aid pharmacies.  The burglaries appeared linked by a common *modus operandi* – the disabling of pharmacy alarm systems by cutting external telephone lines.  By May 2010, the FBI had identified Harry Katzin as a potential person of interest.  Harry Katzin and another man recently had been apprehended as they attempted to burglarize a Rite Aid in Egg Harbor City, New Jersey.  Through background checks, the FBI also learned that Harry Katzin, as well as his brothers Michael and Mark, had criminal histories that included arrests for burglaries and thefts.

As the investigation continued, Special Agent Steven McQueen learned that Harry Katzin was possibly implicated in other suspicious incidents involving Rite Aid pharmacies.  For instance, on October 23, 2010, police in Landsdowne, Pennsylvania stopped Harry Katzin after receiving a report of suspicious activity.  Police observed at the time that he had cuts on his hands and arguably provocative tools in his car.  The police allowed him to go; however, they discovered the next day that the phone lines to a nearby Rite Aid store had been cut, and that burglaries had been attempted at two other local Rite Aid establishments.

In the early morning hours of November 18, 2010, Harry Katzin, Michael Katzin, and one other individual were stopped by police as they sat in a parking lot near a Rite Aid pharmacy in a dark-colored Dodge Caravan registered to Harry Katzin.[2]  The vehicle was searched, and the

---

[2]      The ownership and possession of this Dodge Caravan was the subject of testimony and argument at the April 24, 2012 hearing, in relation to Defendants Michael and Mark Katzin's standing argument by which Michael and Mark hoped to persuade the Court they were entitled to challenge the intrusion by police into the Caravan.  Defendants claim that the car was purchased with money contributed by each of the three brothers, primarily to drive their mother to medical appointments; they also contend that they each regularly drove the car and paid for its upkeep.  Because the Court need not resolve the ownership/possession issue to decide the question of standing, the Court will not include here a more detailed recitation of the facts (or the many factual gaps) surrounding that issue.

2

police found tools, gloves, and ski masks, which Harry Katzin explained were tools for his employment as an electrician.  The police allowed the men to leave.  Later that same day, Special Agent McQueen visited the scene and learned that the telephone lines to the Rite Aid pharmacy had been cut; however, it was unclear whether they had been cut the prior evening or sometime in the more distant past.  A week later, on November 26, 2010, a Rite Aid in Gibbstown, New Jersey was burglarized using the same method of defeating security, and video surveillance from a nearby grocery store showed a dark-colored Dodge Caravan parked in the shopping center parking lot for a long period of time in the early morning hours of November 26.

In late November or early December of 2010, the FBI performed physical surveillance of Harry Katzin and determined that he often parked the Dodge Caravan on the 3500 block of Mercer Street in Philadelphia, near the home of a relative with whom Harry Katzin seemed to be staying.  Because the surveillance team was not able to provide as much coverage of Harry Katzin as desired, Special Agent McQueen requested the installation of a GPS tracker to the Dodge Caravan.  A team of agents affixed a battery-powered GPS device to the exterior of the Dodge Caravan while it was parked on the 3500 block of Mercer Street.  According to testimony at the September 15, 2011 hearing, the installation took place on December 13, 2010.[3]

Late on December 15, 2010, while monitoring the information output from the GPS

---

[3]     At the April 24, 2012 hearing, the Government argued that the device was actually attached in the early morning hours of December 14, 2010, positing that the FBI agents who testified that the device was attached on December 13, 2010 meant that the team of agents who installed the device went out late in the evening of December 13 and actually attached the device in the wee hours of December 14.  In support, the Government pointed to an exhibit that appears to be a print-out of the location data generated by the GPS and has an initial entry in the early morning hours of December 14, 2010.  Real or not, a 24-hour discrepancy is of no ultimate moment in this case, however, as will be discussed further, *infra*.

device, Special Agent McQueen noticed that the Dodge Caravan had departed the city of

Philadelphia and was traveling north on Interstate 476.  Comparing the GPS tracking information

to mapping software loaded with Rite Aid locations, Special Agent McQueen determined that the

Dodge Caravan took I-476 to I-78, left the highway, and then stopped near a Rite Aid store in

Hamburg, Pennsylvania.  He enlisted the assistance of the Pennsylvania State Police, who

established a perimeter near the Rite Aid.  There is no evidence that law enforcement personnel

actually saw the Dodge Caravan at the scene of the burglary that occurred at the Hamburg Rite

Aid pharmacy; Special Agent McQueen testified that he specifically had instructed state troopers

and local law enforcement to keep a wide perimeter so as to ensure that the occupants of the

vehicle were not alerted to police presence.

When the Dodge Caravan finally left the Hamburg Rite Aid's vicinity, Special Agent

McQueen alerted the state police, and state troopers followed the Caravan back onto the

highway.  As state troopers followed the car, at no time did they observe the driver violate any

traffic laws.  Meanwhile, a Hamburg police officer visited the Rite Aid to verify that a burglary

had taken place.  After receiving confirmation that the Rite Aid had, indeed, been burglarized,

the state troopers pulled over the Dodge Caravan.  Driver Harry Katzin and passengers Mark and

Michael Katzin were arrested, and the Dodge Caravan was taken to state police headquarters.

After a search warrant was obtained for the Dodge Caravan, law enforcement officers discovered

stolen merchandise from the Rite Aid pharmacy, including the pharmacy's surveillance system

and Schedule II drugs, in the vehicle.[4]  Subsequently, all three of the brothers were charged with

---

[4]	Officers testified that they could see in plain view what appeared to be store
merchandise in the back of the Dodge Caravan at the time of the stop and before the actual search
of the Caravan was executed.

pharmacy burglary and possession of Schedule II drugs with intent to distribute.

**DISCUSSION**

The three Katzin brothers have moved to suppress the evidence discovered as a result of the GPS monitoring of the Dodge Caravan.[5]  Each argues that the warrantless installation and monitoring of a GPS tracker violated their Fourth Amendment rights, particularly in light of the Supreme Court's recent decision in *Jones*.  Michael and Mark Katzin further argue that, even though Harry Katzin was the driver and only his name is on the Caravan's title, they each have standing to raise objections to the search.  The Government counters (1) that reasonable suspicion and/or probable cause without a warrant is sufficient to justify the use of the GPS device, (2) that, in any event, it is entitled to invoke the good faith exception to the exclusionary rule, and (3) that Michael and Mark Katzin lack standing to contest the GPS evidence.  Notably, the Government does *not* raise any independent source or inevitable discovery arguments with respect to the evidence obtained as a result of the GPS tracking in this case.

The Court will begin by analyzing *Jones* and then will address each of the Government's arguments against suppression.

### A.    The Supreme Court *Jones* Decision

While the suppression motions in this case were pending, the Supreme Court decided *United States v. Jones*, 132 S. Ct. 945 (2012), effectively putting an end to the debate (and the

---

[5]    Defendants also initially argued that the police lacked probable cause or even reasonable suspicion to stop the vehicle for various reasons unrelated to the GPS monitoring, but because the GPS argument will dispose of the issue, the Court need not address these additional arguments.

circuit split)[6] over whether the installation of a GPS tracker on a vehicle parked in a public street, coupled with the tracking of the vehicle by means of the GPS device, constitutes a search or seizure under the Fourth Amendment.  Because the questions answered – and unanswered – by the Supreme Court in *Jones* are integral to reaching a decision in this matter, the Court arguably is obliged to examine it in some detail.

After an extensive investigation of Antoine Jones's possible participation in drug trafficking activities, including the use of visual surveillance and wiretapping, the Government sought a warrant authorizing the use of an electronic tracking device on Mr. Jones's wife's car.[7] *Id.* at 948.  A judge issued the warrant, which authorized installation of the GPS device within 10 days in the District of Columbia.  FBI agents failed to comply with the warrant's temporal and geographic limitations, however, and installed the device on the 11th day in Maryland when the car was parked in a public lot.  Agents monitored the movements of the vehicle for 28 days, generating more than 2,000 pages of location data.  *Id.*

Using this information, the Government indicted Mr. Jones.  Mr. Jones moved to suppress the GPS data, and the district court granted the motion only in part, suppressing the data obtained while the car was parked in Mr. Jones's own garage, i.e., on private property.  After one hung jury and another indictment, Mr. Jones was eventually convicted of the drug trafficking conspiracy and sentenced to life in prison.  *Id.* at 948-49.

---

[6]     The various differing opinions in courts of appeals on the central issue addressed in *Jones* did not include any opinion of the Third Circuit Court of Appeals.  This absence figures prominently in one of the primary issues that dictate the outcome of this case.

[7]     Although the car was registered in Mr. Jones's wife's name, the Government acknowledged that Mr. Jones was the car's exclusive driver and did not assert a standing challenge; thus, the Supreme Court did not address this issue.  *Jones*, 132 S. Ct. at 949 n.2.

The D.C. Circuit Court of Appeals reversed Mr. Jones's conviction, holding that the evidence obtained by the warrantless use of a GPS device violated the Fourth Amendment and should have been suppressed.  *Id.* at 949; *see United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010).  Evaluating the facts in light of the reasonable expectation of privacy jurisprudence set forth by the Supreme Court, the court of appeals found that individuals have a reasonable expectation of privacy in the whole of their movements for a month-long period:

> The whole of one's movements over the course of a month is not constructively exposed to the public because, like a rap sheet, that whole reveals far more than the individual movements it comprises.  The difference is not one of degree but of kind, for no single journey reveals the habits and patterns that mark the distinction between a day in the life and a way of life, nor the departure from a routine that, like the dog that did not bark in the Sherlock Holmes story, may reveal even more.

*Maynard*, 615 F.3d at 561-62.

While acknowledging the Supreme Court's prior holding in *United States v. Knotts*, 460 U.S. 276 (1983), that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," the court distinguished the limited information conveyed by the monitoring of an electronic beeper during a single 100-mile trip at issue in *Knotts* from "the-whole-is-greater-than-the-sum-of-its-parts" amount of information collected during the lengthy monitoring period at issue in the case then in front of the court.  *Id.* at 557-58.  The court noted that the Government belatedly argued that it could take refuge in the automobile exception because it had probable cause to install the monitoring device, but held that the Government had waived that argument by not raising it at the trial court level.  Moreover, the court found that, even if the Government had not waived the argument, the narrow automobile exception only authorizes a search of a car if police have

reason to believe the vehicle contains contraband; the exception does not itself authorize the installation of a tracking device.  *Id.* at 566-67.

The Government then appealed, and the Supreme Court granted *certiorari*.  While the Court unanimously agreed that the court of appeals' decision should be affirmed, a five-justice majority embraced grounds different from those articulated in the circuit court's opinion.  Rather than use the reasonable expectation of privacy test established in *Katz v. United States*, 389 U.S. 347 (1967), the majority opinion, authored by Justice Scalia, reached further back into Fourth Amendment history and held that the attachment of GPS device to a target's private property for the purpose of monitoring that target's movements is a trespass, which constitutes a Fourth Amendment search.  *See Jones*, 132 S. Ct. at 949-50.  The majority's narrow holding did not address the issue of long-term monitoring, with or without a physical intrusion on private property; it simply reaffirmed the common-law trespassory theory underpinning the Fourth Amendment and called *Katz*'s "reasonable expectation of privacy" standard an addition to, not a substitute for, this long-standing trespass doctrine.  *Id.* at 951-52.  The Court noted that the Government had waived its argument that its GPS monitoring was, in any event, justified by its reasonable suspicion and even probable cause to believe that Mr. Jones was involved in drug trafficking.  Therefore, the Supreme Court specifically did not consider whether a warrant (or something less) would suffice to insulate such a search from later judicial scrutiny and the exclusionary rule.  *Id.* at 954.

A concurring opinion, authored by Justice Alito and joined by three other justices,[8]  took

_____

[8]      Justice Sotomayor also authored a brief concurring opinion.  Justice Sotomayor's concurrence, while accepting the majority's trespass theory *and* agreeing with Justice Alito's reasoning that long-term GPS monitoring "'impinges on expectations of privacy'" with or

much the same approach as the District of Columbia Circuit Court, applying the *Katz* "reasonable expectation of privacy" test and concluding that four weeks of continual GPS monitoring constitutes a search.  According to Justice Alito, the physical intrusion on private property is inconsequential in comparison to the actual intrusion on a person's reasonable expectations of privacy resulting from the long-term monitoring of that person's movements.  While, according to the concurrence, "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable," no matter what means are employed,[9] "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."  *Id.* at 964.

### B.      Necessity of a Warrant

While acknowledging that *Jones* fundamentally changed the legal landscape with respect to whether GPS monitoring constitutes a Fourth Amendment search, the Government here seizes on the Supreme Court's failure to explicitly address the question of whether a warrant is required to perform GPS monitoring and compares the Katzin facts to the facts in cases in which the Supreme Court recognized an exception to the general rule that a warrant is needed to perform a Fourth Amendment search or seizure.  This Court, however, in the final analysis, has not been

---

without a physical intrusion, also expressed concern that evolving technology will fundamentally change what is meant by a "reasonable expectation of privacy," noting that individuals often have no choice but to reveal private information to third parties (e.g., calls and texts to and from cell phones, internet browsing history) and yet still would be offended by government monitoring of the very same data.  *Id.* at 955-57 ("More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.")

[9]        Justice Alito declined to define what "relatively short-term monitoring" might mean, or what it might not include.

persuaded that the GPS monitoring that occurred in this case is factually analogous to any existing exceptions to the warrant requirement, or merits a new exception for Fourth Amendment warrantless search or seizure law.  *See Katz*, 389 U.S. at 357 (holding that a warrantless search is "per se unreasonable under the Fourth Amendment – subject to only a few specifically established and well-delineated exceptions").

### 1.     *Reasonable Suspicion*

The Government draws a parallel between the 2- or 3-day long GPS surveillance in this case and the facts in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny – cases in which the Supreme Court found that the intrusion on privacy is outweighed by legitimate government interests, such that neither a warrant nor even probable cause are required.  In these cases, the human objects of the searches or seizures, such as student athletes (*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995)), probationers (*United States v. Knights*, 534 U.S. 112 (2001), and parolees (*Samson v. California*, 547 U.S. 843 (2006)), very clearly had reduced expectations of privacy – in some cases, so much so that not even individualized reasonable suspicion was required to conduct a search.  *See, e.g., Samson*, 547 U.S. at 847.

The Government argues that GPS monitoring of a vehicle, at least for a limited period of time on public roads, is similar to the *Terry* situation, in that (1) individuals have a diminished expectation of privacy when traveling on public thoroughfares, (2) the intrusion of the installation of a tracking device is minimal, and (3) the information gathered is less detailed than would be achieved with visual or aural means of surveillance.  It points out that the GPS tracker cannot even reveal information such as who is in the car, who is driving the car, or what the occupants do when they arrive at their ostensible destination – all information that would be

10

revealed (or at least more easily surmised) by traditional visual surveillance.  On the other hand, the Government argues, the possibly unfettered uses by law enforcement of GPS tracking to gather evidence to, for instance, establish probable cause in cases of serious crimes like drug trafficking, terrorism, and the like strongly outweigh the concern about intrusion.

What the Government has failed to show, however, is that *in this case* it had "special needs, beyond the normal need for law enforcement" which would have made "the warrant and probable-cause requirement impracticable."  *See New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985). The "need" for surveillance articulated by the Government here, in this case, with these facts, was the same as the "need" to investigate any criminal activity.  Although for many months the Government strongly suspected Harry Katzin of engaging in repeated burglaries, including a strong instinct as to the targets of those burglaries and the *modus operandi* for them, it had no particular information that would have led law enforcement to believe that another specific crime was imminent when agents installed the GPS device on his car.  And as much as the Government attempts to minimize the intrusion caused by GPS tracking, the Supreme Court's particular focus in *Jones* – not on the "public streets" aspect of the intrusion but on the "private property" aspect of the intrusion – strongly signals that the Supreme Court does not consider GPS tracking as a lesser intrusion than other means of surveillance or investigation.  *See Jones*, 132 S. Ct. at 953-54; *see also Knotts*, 460 U.S. at 283-84 (distinguishing the one-trip beeper monitoring involved in that case from "dragnet" type 24-hour surveillance).  In short, there was nothing special about law enforcement's need to use GPS tracking to investigate Harry Katzin or his movements vis à vis prior crimes that would heighten its importance so as to outweigh an intrusion that the Supreme Court has clearly held to be an invasion of private property.

2.       *Probable Cause*

The Government also argues that even if reasonable suspicion is not enough, it had probable cause to attach the GPS tracker to the Katzin vehicle and is entitled to the so-called automobile exception.  Setting aside for a moment the question of whether law enforcement actually had probable cause, the simple fact that a car was involved in this case does not automatically entitle the Government to the automobile exception.  The automobile exception allows law enforcement to perform a warrantless search of a vehicle when "probable cause exists to believe it contains contraband."  *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  The exception exists in acknowledgment of the exigent circumstances present when contraband is contained in a vehicle, making it impractical and perhaps even impossible to secure a warrant before the contraband is transported out of law enforcement's reach.  *See Carroll v. United States*, 267 U.S. 132, 153 (1925).

The rationale underlying the automobile exception does not justify the warrantless installation of a GPS tracker, at least under the facts presented here.  Certainly, the Government's Katzin investigation efforts could not qualify for the exception as it currently exists.  The Government has presented no evidence in this case that it had probable cause to believe that the Katzin vehicle contained contraband at the time of the installation of the GPS device, i.e., at the time of the "search."  Indeed, if that were the case, there was no point to the installation of the device because surely the Government would have physically searched the interior of the vehicle rather than formulated a plan to track it, having waited until the middle of the night in order to install a GPS device.

Furthermore, the Government cannot draw a parallel between the circumstances involved

in a traditional automobile exception case and the situation here. There simply was no exigency requiring quick action. The Government has presented no evidence that it had specific information that another burglary would soon be committed by Harry Katzin, using the Dodge Caravan on which they placed a tracker. That he and his brothers did allegedly commit a burglary a few days after the tracker was installed is beside the point – the Court will not judge the exigency of the situation at the time of the installation based on later events that could not have been (and were not) predicted with any accuracy at the time. Hindsight will not excuse the omission of legal requirements. Quite simply, the Government had been investigating a string of pharmacy burglaries for several months, had gathered evidence pointing to Harry Katzin, and then had attached a GPS device based on this evidence, presumably in the *hopes* that it would catch him in the act at some unspecified point in the future. Certainly, then, in this case, there was more than ample time for the Government to have obtained a warrant before employing the GPS device on the Katzin Caravan.

### C.     The Good Faith Exception

Absent a finding that reasonable suspicion or probable cause satisfies the Fourth Amendment without a warrant in this case, the Government next argues that it is entitled to the good faith exception to the exclusionary rule. Essentially, the Government contends that the FBI agent involved in this case, after consulting with the U.S. Attorney's Office, acted in good faith reliance on case law in other circuits permitting warrantless GPS monitoring, and that, therefore, the Government should not be penalized by the exclusionary rule.

At the time of the GPS monitoring in this case, courts of appeals in two circuits had held

that installation and monitoring of a GPS device is not a Fourth Amendment search,[10] courts of

appeals in two others had held, or at least suggested, that reasonable suspicion (but not a warrant)

was required to install and monitor a GPS device,[11] and the D.C. Circuit Court of Appeals had, as

discussed above, held that the warrantless installation and monitoring of a GPS device was a

violation of the Fourth Amendment.[12]  The Third Circuit Court of Appeals and Supreme Court

were silent on the issue as of December, 2010 when the authorities installed the GPS device on

the Katzin Caravan.

 In support of the good faith argument, the Government relies primarily on *Davis v. United*

*States*, 131 S. Ct. 2419 (2011).  In that case, Willie Davis moved to suppress evidence found

during the search of a vehicle in which he was a passenger, which took place after he and the

driver were handcuffed and placed in a police car.  *Id.* at 2425.  At the time of the search,

precedent in the circuit where the search was conducted clearly set forth a brightline rule

allowing police to search vehicles contemporaneously with arrests of recent occupants, regardless

of whether the occupants were still within reach of the vehicle.  After the trial court denied Mr.

Davis's motion and he had appealed his subsequent conviction, the Supreme Court decided

*Arizona v. Gant*, 556 U.S. 332 (2009), in which the Court departed from the brightline rule

regarding vehicle searches previously adopted by most courts.  Instead, the Supreme Court held

that a vehicle search is not automatically permitted unless the occupants are still "'unsecured and

---

[10]    *See United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007); *United States v. McIver*,
186 F.3d 1119 (9th Cir. 1999).

[11]    *See United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010); *United States v.
Michael*, 645 F.2d 252 (5th Cir. 1981).

[12]    *See Maynard*, 615 F.3d 544.

within reaching distance of the passenger compartment at the time of the search.'" *Id.* at 2425

(quoting *Gant*, 556 U.S. at 343).  Because the police acted in good faith in relying on binding

appellate precedent at the time of the search, the Supreme Court upheld the Eleventh Circuit's

holding that the exclusionary rule should not apply in Mr. Davis's case.  The Court likened this

extension of the exclusionary rule to cases in which police had relied on subsequently invalidated

statutes or warrants.  *Id.* at 2428-29.[13]

Here, there was no binding Third Circuit precedent on the issue at hand (or even arguable

ambiguity in Circuit case law), but rather a split of *other* circuits with regard to the Fourth

Amendment significance of non-consensual GPS monitoring.   After *Davis*, only a very small

handful of federal court opinions have even discussed the extension of *Davis*'s holding to an area

of unsettled law, and all three deal with GPS monitoring.

In *United States v. Nwobi*, No. CR 10-952(C)GHK-7, 2012 WL 769746 (C.D. Cal. Mar.

7, 2012), the court held that the good faith exception applied to defeat the defendant's motion to

suppress evidence obtained through warrantless GPS monitoring because binding Ninth Circuit

precedent at the time of the subject search allowed as much.  In arguing against allowing the

exception, the defendant attempted to compare his case to the case pending before the D.C.

Circuit in *United States v. Maynard*.  The court pointed out that the good faith exception "could

not have applied to the evidence sought to be suppressed in *Jones* . . . because at the time of the

---

[13]     In a concurring opinion, Justice Sotomayor expressed concern that the majority's
holding in *Davis*, a case in which the conduct was specifically authorized by binding appellate
precedent, could be extended by lower courts to less certain situations, such as when the law
governing the constitutionality of a search is unsettled.  *Id.* at 2435.  She emphasized that the
holding in *Davis* was limited to the narrow facts in *Davis* and that the Court was specifically *not*
resolving the question of whether the exclusionary rule would result in appreciable deterrence in
a situation in which the law was not settled.  *Id.* at 2435-36.

installation and use of the GPS device in *Jones*, there was no binding D.C. Circuit precedent authorizing the warrantless installation of GPS tracking devices on suspects' vehicles," in contrast to the Ninth Circuit, in which there was such binding precedent. *Id.* at *3. Thus, the question presented by the Katzin brothers was not squarely before the court in *Nwobi*, but that court did acknowledge *Davis*'s limitations.

In *United States v. Leon*, No. CR 09-00452, 2012 WL 1081962 (D. Haw. Mar. 28, 2012), a district court denied a motion to suppress evidence obtained through GPS monitoring in part because of law enforcement officers' reliance on binding appellate precedent and in part because Supreme Court case law at the time of the monitoring could have been reasonably construed to support the actions of the officers. In that case, law enforcement officials attached a GPS device to the defendant's car without first obtaining a warrant and left it there for over five months, which the Government conceded was unconstitutional after *Jones*. Rather than simply deciding that the good faith exception question was answered by reliance on clear Ninth Circuit precedent allowing for the placement of a GPS device without a warrant, the court divided the inquiry into two parts: the placement of the device and the prolonged use of the device. *Id.* at *3.

As to the placement of the device, the court, as mentioned, found that binding Ninth Circuit precedent directly governing the placement of GPS devices without a warrant existed at the time of the search and that therefore the Government was entitled to the good faith exception as to that aspect of the search. As to the prolonged use of the device, the court noted that "neither Supreme Court nor Ninth Circuit binding precedent in 2009 authorized the agents to continuously monitor the location of the vehicle in public places for a prolonged period of time." *Id.* at *4. Without any discussion of the *Davis* concurrence or an acknowledgment of the narrow

16

holding in *Davis*, the court went on to determine that law enforcement in *Leon* had an objectively reasonable good faith belief that their actions were lawful because of the *lack* of any case law holding the prolonged use of GPS to be unconstitutional and because of Supreme Court precedent generally holding that a person "'travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.'"  *Id.* at *5 (quoting *Knotts*, 460 U.S. at 281).  *See also United States v. Luna-Santillanes*, No. 11-20492, 2012 WL 1019601, at *9 n.5 (E.D. Mich. Mar. 26, 2012) (citing *Davis* and noting in *dicta* that the good faith exception would apply "because the use of a GPS device on a vehicle without first obtaining a search warrant was a widely-accepted practice in the police community that had *not* been held unconstitutional by the Sixth Circuit Court of Appeals") (emphasis added).

Thus, at least one court squarely faced with an exclusionary rule issue in a case involving GPS monitoring has strayed from the limitations set forth in *Davis* and expanded the good faith exception to include reliance on a reasonable interpretation of existing case law, and another has indicated in *dicta* that it would not hesitate to apply *Davis* in a similar manner.  Certainly an argument could be made – and the Government in this case clearly makes it – that the more general good faith exception language found in *Davis* and other similar cases would allow for an individualized determination of whether the officer's actions were objectively reasonable in each specific case.

However, to move beyond the strict *Davis* holding sharpens the instruments that can effectively eviscerate the exclusionary rule entirely.  In this case, at the time the GPS device was placed on the Dodge Caravan there were four circuit courts of appeals that arguably could have supported the Government's conduct and one that would not have, meaning that fewer than half

of the circuits had even weighed in on the question.[14]  If law enforcement is permitted to rely on

authority from a minority of other circuits to support the constitutionality of its investigatory

practices, where does a district court draw the line when binding precedent later renders those

practices unconstitutional?  Is law enforcement reliance on a significant minority or, somewhat

better, a bare majority of circuits to have addressed the topic enough, or is an overwhelming

majority, if not unanimity, required?  Does it matter *which* circuits (or which panels in which

circuits) support or condemn the investigatory practice?  Does it matter how many circuits have

squarely addressed the issue?  The difficulty presented by the dilemma ought to be manifest.

Extending *Davis* also would move law enforcement further from the solid ground on

which other good faith exceptions to the exclusionary rule stand.  Those exceptions generally

involve reliance on unequivocally binding legal authority, *see Illinois v. Krull*, 480 U.S. 340,

349-50 (1987) (good faith exception covers subsequently invalidated statutes); *United States v.

Leon*, 468 U.S. 897, 920-21 (1984) (law enforcement acted in good faith relying on a judicially

approved warrant later found to be improvidently granted) or isolated non-recurring errors, *see

Herring v. United States*, 555 U.S. 135, 137 (2009).  Essentially, in each of these cases, the

mistake was made by some other neutral branch of government, and not by law enforcement, or

else, as in *Herring*, was not the product of a conscious decision; neither of those categories

encompass the conduct in this case.

Other familiar policy issues persuade the Court that a *Davis*-like good faith exception to

the exclusionary rule should not be stretched to authorize the warrantless GPS tracker here. The

---

[14]        Again, the Court is constrained to point out that this Circuit was in the "silent
majority" on the issue.

Supreme Court's general language describing the exclusionary rule states that it applies in cases of "recurring or systemic negligence."  *Herring*, 555 U.S. at 144.  The risk of institutionalizing a policy of permitting reliance on non-binding authority, particularly in the face of other, contrary non-binding authority, at least borders on being categorized as systemic negligence.  Indeed, opening to the Government the shelter of the good faith exception in this case would encourage law enforcement to beg forgiveness rather than ask permission in ambiguous situations involving the basic civil rights.  In the face of *Jones*, this the Court will not do.  As the Supreme Court noted in *United States v. Johnson*, 457 U.S. 537, 561 (1982), in discussing the retroactive application of Fourth Amendment jurisprudence:

> If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior.  Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.

*Id.* (Emphasis in original; quotations and footnote omitted).  Thus, the Court will not extend the good faith exception to encompass the conduct in this case.[15]

**D.     Standing**

---

[15]     Having reached this conclusion after close consideration of the cited case law, the Court hastens to emphasize that it has no concern that the prosecutorial and law enforcement personnel here were undertaking their work in this investigation and prosecution in a calculated or otherwise deliberately cavalier or casual manner in the hopes of just meeting the outer limits of the constitutional contours of the Katzins' rights.  Indeed, these actors could well profess surprise at the specific outcome of *Jones*.  Nonetheless, this is neither the first – nor likely the last – time when rulings by appellate courts will more precisely define standards, requirements, processes and procedures that could have been, but were not, anticipated.

Having held that evidence obtained as a result of the warrantless application of a GPS device to the Dodge Caravan must be suppressed, the final question to answer is against whom must it be suppressed.  All parties concede that Harry Katzin, as the driver and titleholder of the vehicle, has standing to challenge the affixing of the device.  However, the Government argues that Mark and Michael Katzin, passengers in the vehicle at the time it was stopped by police in the early morning hours of December 16, 2010, do not have standing to object to the GPS tracking device and data.  Mark and Michael Katzin argue that they do have standing (1) because they each co-owned the vehicle with their brother Harry, and (2) because, under *United States v. Mosley*, 454 F.3d 249 (3d Cir. 2006), they, too, were subject to an illegal seizure when the Dodge Caravan was stopped as a result of the GPS monitoring.  Because the Court holds that the second argument sufficiently carries the day for Mark and Michael, it need not address the first.

In *United States v. Mosley*, 454 F.3d 249, the Third Circuit Court of Appeals held that when a vehicle is illegally stopped by police, no evidence found in it may be used against any of the occupants, regardless of any expectation of privacy in the vehicle.  In *Mosley*, the defendant left a nightclub in a car driven and owned by a man he had just met.  Acting on an anonymous tip only and without observing any traffic violation, police stopped the vehicle, found multiple firearms, and arrested the defendant and the driver, charging them both with gun posession.  *Id.* at 251.  Because an anonymous tip alone cannot support an investigatory stop, the stop of the car was illegal, and because a vehicle stop is a seizure of every individual in the car, Mr. Mosley, even as a passenger with absolutely no claim on the vehicle, was subject to an illegal seizure when the police stopped the car based on nothing more than an anonymous tip.  *Id.* at 267-69. Thus, evidence obtained as a result of the stop and subsequent vehicle search was suppressed as

to Mr. Mosley.  *Id.*

Neither in its briefing, nor during oral argument, was the Government able to offer any argument distinguishing *Mosley* or citing any case which runs contrary to the Third Circuit Court of Appeals's holding therein.  The Government's primary argument in distinguishing *Mosley* seems to be that the officers were operating in good faith,[16] the same argument it made with respect to the GPS tracking.  *See* April 24, 2012 Tr. at 127:1-129:13.  That argument has been unsuccessful in this case for the reasons already explained.  Because the GPS evidence taints the entire vehicle stop process, and there was no independent traffic violation or other reason to stop the vehicle, *Mosley* squarely applies, whether or not the passengers had a possessory interest in the vehicle.  Thus, both Mark and Michael Katzin have standing, along with their brother Harry, as both were subject to an illegal seizure when the vehicle in which they were passengers was stopped.  Accordingly, they, too, can challenge the introduction of the evidence gleaned from the Caravan.

## CONCLUSION

For the foregoing reasons, Defendants' motions to suppress evidence obtained through the use of warrantless GPS monitoring are granted.  An appropriate Order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[16]     As previously noted, this case has not prompted arguments under the other exceptions to the exclusionary rule, such as the independent source or inevitable discovery doctrines.